## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**DONNA M. RAINES,**

    **Plaintiff,**

**vs.**                                **CIVIL ACTION NO. 3:21-CV-00045**

**KILOLO KIJAKAZI, ACTING**
**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered January 20, 2021 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings along with her Brief in Support of Motion for Judgment on the Pleadings, and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 15, 16, 17)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or alternatively, remand (ECF No. 15); **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 17); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Donna M. Raines, (hereinafter referred to as "Claimant"), protectively filed her application for benefits on October 6, 2018, alleging disability since September 24, 2017 due to diabetes type 2, hypertension, peripheral neuropathy, depression, gastroesophageal reflux disease (GERD), asthma, insomnia, as well as leg, back and foot pain (Tr. at 15, 191-197, 236). Her claim was initially denied on February 26, 2019 (Tr. at 98-102) and again upon reconsideration on May 6, 2019 (Tr. at 107-113). Thereafter, Claimant filed a written request for hearing on June 19, 2019 (Tr. at 114-115).

An administrative hearing was held on May 7, 2020 before the Honorable Nathan Brown, Administrative Law Judge ("ALJ") (Tr. at 34-67). On June 22, 2020, the ALJ entered an unfavorable decision. (Tr. at 12-33) On July 8, 2020, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 188-190) The ALJ's decision became the final decision of the Commissioner on November 18, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On January 18, 2021, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11) Subsequently, Claimant filed a Motion for Judgment on the Pleadings along with a Brief in Support of Motion for Judgment on the Pleadings (ECF Nos. 15, 16), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 17). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant completed high school and attended three years of college to become a nurse. (Tr. at 237) She worked as a staff nurse, director of nursing, and most recently as a charge nurse at a nursing home until she stopped working in September 2017. (Tr. at 216, 238) She was 60 years old as of the alleged onset date and considered a person closely approaching retirement age throughout the underlying proceedings. See 20 C.F.R. § 404.1563(e). (Tr. at 36)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant filing for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant

work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Section 404.1520a(c). This Section provides as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently,

4

appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 of this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

5

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant meets the requirements for insured worker status through December 31, 2022. (Tr. at 17, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since September 14, 2017, the alleged onset date. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: mild degenerative disc disease of the lumbar spine; mild right hip osteoarthritis; diabetes; neuropathy; left ankle osteoarthritis; left shoulder arthralgia; psoriasis; and asthma. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded that Claimant's impairments or combination thereof did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 19, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work except:

> [T]he claimant is capable of lifting, carrying, pushing, or pulling 20 pounds occasionally and 10 pounds frequently; sitting for six hours; and standing or walking for six hours in a work day. The work can involve no greater than frequent pushing, pulling or stomping with the bilateral lower extremities. She can operate foot controls bilaterally frequently. She can frequently reach overhead with her left arm. The claimant can climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, balance (as defined by the DOT and SCO) occasionally, stoop

occasionally, kneel occasionally, crouch occasionally, and crawl occasionally. The claimant can work at unprotected heights occasionally, can work around moving mechanical parts frequently, and can operate a motor vehicle frequently. She can work in weather frequently, in humidity occasionally, in extreme cold frequently, in atmospheric conditions occasionally, and in extreme heat frequently.

 (Tr. at 22, Finding No. 5)

At step four, the ALJ found Claimant was capable of performing her past relevant work as a charge nurse and director of nursing. (Tr. at 28, Finding No. 6)

Finally, the ALJ determined Claimant had not been under a disability from September 14, 2017 through the date of the decision. (Id., Finding No. 7)

**Claimant's Challenges to the Commissioner's Decision**

In support of his appeal, Claimant asserts that the ALJ failed in his duty to fully develop the medical evidence regarding Claimant's impairments; the RFC assessment provided by her primary care physician, Tammy Bannister, M.D., as well as the overall medical record show that Claimant is disabled (ECF No. 16 at 12-16). Further, the ALJ "completely ignored the claimant's testimony and the medical documentation from his treating physician of her medical and mental impairments and the limitations they cause her." (Id. at 16) Claimant also contends that the ALJ failed to properly consider and evaluate the combined effects of her impairments, which is supported by the uncontradicted medical evidence from multiple treating physicians that prove she is disabled. (Id. at 16-17) The ALJ failed to consider the medical records of longtime treating physicians and instead substituted his own opinion for those of Claimant's treating physicians. (Id. at 17) Claimant argues the ALJ's decision "lacks support of any physician opinion" and that this Court should find her disabled, or alternatively, to remand so that her impairments can be fully developed and a more accurate hypothetical question be posed to the vocational expert concerning

Claimant's RFC. (Id. at 18)

In response, the Commissioner asserts that Claimant failed to meet her burden of proof that she was disabled, and that the ALJ satisfied his duty to develop the evidence to assess the appropriate RFC based upon all the relevant evidence. (ECF No. 17 at 11-13) The Commissioner also argues that the ALJ did consider Claimant's testimony and self-reports regarding her limitations, and compared them with the objective medical evidence when assessing her RFC. (Id.) Additionally, the ALJ considered Claimant's treating physician's opinions, and reasonably found them unpersuasive under the pertinent Regulations. (Id. at 13) The Commissioner points out that the ALJ is not required to develop the evidence, as she was represented by counsel and at no time requested assistance to procure additional records; further, Claimant's counsel advised the ALJ that the record was complete at the administrative hearing. (Id. at 13-14) The Commissioner further argues that Claimant fails to not only identify any specific Listing the combination of her impairments supposedly met, but also fails to identify any specific evidence in support of his generalized argument for same. (Id. at 15) The Commissioner points out that at step three, the ALJ did consider Claimant's impairments under the pertinent Listings, as well as the combined effects of her impairments, and proceeded to consider them in the subsequent steps in his analysis. (Id. at 15-16) Finally, the Commissioner states that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 17)

**The Relevant Evidence of Record**[1]

---

[1] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Musculoskeletal Impairments:

In February 2017, Claimant reported to the emergency room after she fell at work in a patient's room, hitting her head against the wall, and catching herself with her left wrist. (Tr. at 529) She reported increased pain in her left shoulder and arm as well as minor headaches. (Id.) X-rays of her left shoulder revealed mild hypertrophic changes but no acute abnormality (Tr. at 532).

In July 2017, Claimant complained of twisting her ankle after falling in a parking lot (Tr. at 408). On examination, Tammy Bannister, M.D., Claimant's primary care provider, noted that she had a limping gait and tenderness in her left ankle; however, she had normal muscle strength and tone (Tr. at 412).

In December 2017, Claimant visited Robert Walker, M.D., as part of her worker's compensation claim (Tr. at 544). On examination, Dr. Walker noted that she had restricted range of motion in her left shoulder due to a fall in February 2017; she could not reach behind her back or above the shoulder level; and she had a positive passive painful arc test (Id.). Dr. Walker concluded that Claimant had a rotator cuff tear and possible labral tear (Id.).

In January 2018, Claimant returned to Dr. Walker complaining of left shoulder pain and stiffness (Tr. at 389). On examination, Dr. Walker noted that while Claimant had pain and restricted range of motion in her left shoulder, she had a normal gait, intact cranial nerves, normal reflexes, and no sensory loss (Tr. at 393). Dr. Walker prescribed a corticosteroid injection in her left shoulder joint (Id.).

In May 2018, Claimant returned to Dr. Bannister complaining of low back and hip pain

(Tr. at 383). She reported caring for her ill mother daily (Id.). On examination, Dr. Bannister noted that Claimant had a limping gait but normal muscle strength and tone (Tr. at 387). Dr. Bannister prescribed hydrocodone-acetaminophen for pain (Tr. at 388).

Throughout 2019, Claimant minimally treated her musculoskeletal impairments with Norco, Prednisone, and Gabapentin prescribed by Dr. Bannister, who generally observed unremarkable clinical findings on exam, such as normal gait and muscle strength (Tr. at 434-435, 472, 478-479, 484, 490, 493, 498-499). Claimant denied any side effects from her medication, except for some mild constipation (Tr. at 429, 473, 485, 493).

In January 2020, Claimant began treatment with Joseph DeLapa, II, M.D., a pain management specialist (Tr. at 458). Claimant complained of chronic low back pain and leg pain, she also reported a history of diabetic neuropathy that caused numbness in her feet (Id.). She reported that she took Norco and Gabapentin and denied any medication side effects (Id.). On examination, Dr. DeLapa noted that while Claimant had increased pain when transitioning from sitting to standing, some tenderness, and increased pain with extension more so than flexion of the lumbar spine, she walked with a normal gait, had a negative straight leg raise, negative Faber test, full 5/5 strength in her legs, and normal deep tendon reflexes (Tr. at 461). Dr. DeLapa ordered an MRI of Claimant's lumbar spine and recommended some home physical therapy exercises (Tr. at 461). The MRI of Claimant's lumbar spine showed normal vertebral alignment, minor facet hypertrophy in her lumbar spine but no distinct disc herniation, and no spinal canal or neural foraminal stenosis (Tr. at 438, 455-456). On a follow-up examination, Dr. DeLapa noted that while Claimant had increased pain when transitioning from sitting to standing and some tenderness in her right side sacroiliac region, she walked with a normal gait, had normal deep tendon reflexes,

10

and full 5/5 strength in her legs (Tr. at 443). Claimant was referred to physical therapy and offered a diabetic nerve cream (Tr. at 445).

Claimant continued to treat with pain management via telemedicine in Spring 2020 and received pain medication and a topical cream for the pain in her feet and legs (Tr. at 546-559).

Diabetes Treatment:

Claimant treated with Dr. Bannister for diabetes and neuropathy as well. Laboratory studies indicated her blood glucose levels were moderately controlled. For example, in December 2019, Dr. Bannister noted Claimant's sugar was stable, as her average glucose level was 154 and her A1C was 7.0 (Tr. at 463, 465, 467). She had neuropathic pain in her feet and legs and took Gabapentin along with her other pain medication (Tr. at 361, 447, 458, 472, 491). Dr. DeLapa also prescribed a diabetic nerve cream that relieved Claimant's leg and foot pain (Tr. at 445, 546, 551, 553). Moreover, on examination, Claimant did not have any loss of sensation or diabetic foot ulcers (Tr. at 393, 531).

Asthma Treatment:

Claimant saw a pulmonologist in September 2018 after she reported to Dr. Bannister that she had stopped all of her asthma medications (Tr. at 370). She reported that she had stopped her asthma medications two years prior and denied any recent cough, shortness of breath, or wheezing (Id.). Claimant had a normal pulmonary examination with no increased work of breathing or signs of respiratory distress, and clear to auscultation of her lungs (Tr. at 374). However, her pulmonary function testing indicated moderate obstruction, so she was prescribed Symbicort and Albuterol (Id.).

Mental Impairments Treatment:

During the relevant period, Dr. Bannister treated Claimant's depression with antidepressants (Tr. 366, 479, 490). While Dr. Bannister noted on some examinations that Claimant had an abnormal mood and flat affect (Tr. at 366, 388, 434, 453, 478, 490, 498), at other examinations, Dr. Bannister noted that Claimant had a normal mood and affect (Tr. at 393, 399, 405, 511, 554). She also noted that Claimant was not suicidal (Tr. at 383, 409, 430, 448, 473, 485, 494). Dr. Bannister did not note any other mental symptoms or limitations.

In January 2020, Dr. DeLapa noted Claimant did not have a thought or mood disorder (Tr. at 443).

The record shows that Claimant did not treat with a mental health specialist, nor did she require any mental health hospitalizations during the relevant period.

Consultative Examination:

In January 2019, Claimant visited Stephen Nutter, M.D., for a consultative examination (Tr. at 415-422). Claimant reported a history of diabetes for 12 years, She reported with hypoglycemic episodes 50% of the nights and three days out of the week during the daytime, making her feel flushed, sweaty, weak and somewhat disoriented; she was told she has "minimal damage" to her eyes (Tr. at 415). Claimant also reported psoriasis for 11 years, and that her feet are very dry and will crack, and is very painful to walk (Id.) She also reported having joint pain for 10 years in her hands, hips, knees, feet and left shoulder which is intermittent; she had injections in her left shoulder, but no joint aspiration done (Id.). She stated that walking, standing, kneeling, squatting, and going up/downstairs increases her knee pain and that walking and standing causes pain in her hips; she reported reaching, lifting, pushing, pulling and using her arms overhead increases her shoulder pain and that she sometimes will trip and fall while standing that she thinks

12

is due to her feet numbness (Tr. at 415-416).

On examination, Dr. Nutter noted that Claimant ambulated with a normal gait; she did not require a handheld assistive device; she appeared stable at station; and comfortable in the supine and sitting positions (Tr. at 417). Claimant's lungs were clear to auscultation and percussion without wheezes, rales, or rhonchi (Id.). She had some pain and tenderness in her left lower rib area due to a reported recent fall and rib fracture (Id.). Claimant had some pain and tenderness of the left shoulder (Id.). She could make a fist bilaterally and had normal and equal grip strength (Id.). She was able to pick up coins and write without difficulty (Id.). Examination of her legs indicated no tenderness, redness, warmth, swelling, fluid, laxity or crepitus of the knees, ankles or feet (Id.). Dr. Nutter noted that Claimant had very dry skin on her heels with thickened and superficially cracked skin (Tr. at 417-418). Straight leg raise testing was normal (Tr. at 418). Claimant had normal muscle strength in the upper and lower extremities; she had normal sensation and symmetrical reflexes (Id.). She could walk on her heels and toes, and she could perform a tandem gait but was only able to squat 80-85% due to calf pain (Id.).

X-rays of Claimant's left ankle showed osteoarthritis with milder subtalar degenerative changes (Tr. at 420). X-rays of her lumbar spine revealed multilevel lumbar degenerative changes (Tr. at 421). X-rays of her right hip showed mild right hip osteoarthritis (Tr. at 422).

State Agency Consultant Opinions:

On February 5, 2019, Amy Wirts, M.D., reviewed Claimant's medical records and found that, despite her impairments, she could perform a modified range of light work with some postural and environmental restrictions: lift/carry and pull upwards 20 pounds occasionally; lift/carry and pull upwards 10 pounds frequently; stand/walk for a total of 3 hours in an 8-hr workday; sit for a

total of 6 hours in an 8-hr workday; push/pull limited in both lower extremities – with no repetitive pushing, pedaling, stomping with the both lower extremities; climbing ramps/stairs occasionally; never climbing ladders/ropes/scaffolds; balancing occasionally; stooping occasionally; kneeling occasionally; crouching occasionally; crawling occasionally; avoid concentrated exposure to extreme cold, heat, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, etc., and hazards (machinery, heights, etc.); and unlimited exposure to noise (Tr. at 75-77). On April 17, 2019, Rabah Boukhemis, M.D., reviewed Claimant's updated medical records and agreed with Dr. Wirts's administrative medical finding (Tr. at 88-90).

On December 6, 2018, Rosemary Smith, Psy.D., a state agency psychologist, reviewed Claimant's medical records and found that she did not have a severe mental impairment as she had mild limitations in her ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself (Tr. at 73). On April 18, 2019, Jeff Boggess, Ph.D., reviewed Claimant's updated medical records and found there was insufficient evidence to make a determination concerning her alleged mental impairments (Tr. at 78-79).

Treating Provider Opinion:

In September 2018, Dr. Bannister commented within her treatment notes that Claimant should consider disability as she thought she could not be gainfully employed (Tr. at 367). In February 2020, Dr. Bannister completed a Residual Physical Functional Capacity Evaluation form where she checked off boxes that Claimant could occasionally lift and carry 10 pounds and frequently lift and carry less than 10 pounds; stand and/or walk less than two hours; and sit less than two hours in an eight-hour workday (Tr. at 520). She proposed that Claimant needed to

alternate her position with sitting and standing every 30 minutes and had a limited ability to push and/or pull with the upper and lower extremities (Id.). Dr. Bannister indicated that Claimant could never climb ramps, stairs, ladders, ropes or scaffolds; occasionally balance, stoop, kneel, and crouch; and never crouch or crawl (Id.). She indicated that Claimant had limited reaching in all directions with her left shoulder but could perform unlimited handling, fingering and feeling (Id.). Dr. Bannister indicated that Claimant must avoid concentrated exposure to humidity, flames, and odors; avoid moderate exposure to extreme cold and heat and vibration; and avoid all exposure to hazards, machinery, and heights (Id.). Dr. Bannister's opinion after reviewing Claimant's medicals for Social Security Disability is that she has been disabled since September 2017 (Id.).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she has low back and hip pain; she described her lower back pain as "aching and nagging and sort of sharp, but not like a puncture-type sharp" and that it is present "24/7". (Tr. at 42-43) She stated that walking, standing, bending, stooping or squatting, sitting, climbing stairs, and lifting increases her pain. (Tr. at 43) She also testified that cold and damp weather increases her back pain. (Id.) She takes medication for her pain daily, but it does not completely alleviate it. (Tr. at 44) Her back pain also interferes with her sleep. (Id.)

Claimant testified that she has hip pain, especially on her right side that goes down her leg into her foot; she cannot walk on any surfaces for longer than 10 to 15 minutes before she needs to sit down because of the pain. (Tr. at 44-45)

Claimant also stated that she has peripheral neuropathy from her diabetes that affects her leg and feet, and described this pain as "stinging and burning" that does not go away easily. (Tr.

15

at 45) With her diabetes, she needs to eat frequent small meals each day because her sugar drops and she gets weak and disoriented. (Id.) She stumbles and falls because of the numbness and pain in her feet. (Id.) Although she takes medication for her diabetes, it does not completely eliminate her symptoms, and that the medication caused gastroparesis which causes nausea and vomiting; her appetite is unaffected by her diabetes. (Tr. at 45-46)

Claimant testified that she injured her left shoulder that she was told was a rotator cuff tear, although an MRI has not confirmed that, but she has limited mobility. (Tr. at 46) Her left shoulder prevents her from lifting, or fastening or buttoning anything behind her back. (Id.) She stated she has pain in her shoulder all the time, especially with motion or trying to lift. (Tr. at 47) The pain affects her sleep as well. (Id.)

Claimant endorsed having restless leg syndrome, which greatly affects her sleep and her "everyday activity". (Id.) She described that her "legs give out in the bed" and she has to keep moving them. (Id.) This condition is aggravated whenever she walks or stands. (Id.) She denied having any swelling in her legs. (Tr. at 48)

Claimant testified that she also has right foot pain, probably caused by "just wear and tear", but she also injured her left ankle which still bothers her. (Id.) If she's on her feet all day, her feet pain increases, but do not swell. (Id.)

For her asthma, Claimant uses inhalers, but she is unable to walk half a block to a block without having to stop and rest; she has shortness of breath that is aggravated by stairs, walking, carrying things to her car, dusty environments, hot and humid air, and cold and dry air. (Tr. at 48-49) When she has an episode of breathing problems, she needs to stop for about 5-10 minutes or

16

more before she can catch her breath; she has these episodes about three to four times daily. (Tr. at 50)

Claimant also has had depression for several years, and that she has no interest in anything. (Tr. at 50-51) Her depression affects her sleep, energy level as well as her ability to concentrate. (Tr. at 51) She has feelings of worthlessness because she is unable to work, and she does not want to be around others and does not socialize. (Tr. at 51-52) She takes medication for her depression, which along with her diabetes medication, causes dry mouth, low energy, drowsiness, and appetite changes. (Tr. at 52) She also feels "foggy". (Id.)

Claimant estimated that she could stand for about 10-15 minutes before needing to sit down, walk for less than a block before needing to stop and take a break, sit for 30-35 minutes before changing positions or standing up, and lift about a gallon of milk with either hand. (Tr. at 53) She is unable to do house chores anymore. (Tr. at 54) She has used a heating pad for her leg and back pain, but it does not relieve it at all. (Id.) She lays down about four or five times a day, for five or ten minutes, due to her pain. (Id.)

In response to the ALJ's questions, Claimant denied receiving any workers' compensation payments for the injuries she sustained at work because she needed to get back to work. (Tr. at 55) She testified that when she worked as a charge nurse, she would treat and lift patients and filled out paperwork; the heaviest patient she helped lift was over 400 pounds. (Tr. at 56) As a charge nurse, she spent the majority of her day standing and walking around. (Tr. at 57) She admitted that when she was the director of nursing, she spent the majority of her days seated, though she "was up and down a lot." (Id.) When she worked as a staff nurse in primary care and not a nursing home, she also treated patients, standing and walking a lot, but also sitting to make phone calls. (Tr. at

57-58) She never saw a specialist for her mental health issues, but had an upcoming appointment. (Tr. at 58) After she stopped working, Claimant took care of her mother for about six months, helping her get up and preparing simple meals for her; she would call a neighbor to lift her if needed. (Tr. at 59)

Vocational Expert ("VE") Testimony:

After listening to Claimant's testimony, the VE determined that Claimant's past work as a charge nurse is classified as light and skilled as generally performed and heavy to very heavy as Claimant performed it. (Tr. at 60) The VE determined that Claimant's past work as a director of nursing is classified as sedentary and highly skilled as generally performed and sedentary to medium as performed by Claimant; her past work as a staff nurse is classified as medium and skilled as generally performed and as light to medium as performed by Claimant at times. (Tr. at 60, 62) After having considered a hypothetical question posed by the ALJ with regard to an individual with Claimant's functional profile, the VE testified that an individual of Claimant's age, education, and vocational background who had Claimant's limitations as described in the RFC, *supra*, would be able to perform Claimant's past relevant work as a charge nurse and director of nursing as generally performed, but not as performed by Claimant, and that Claimant could perform her past work as a staff nurse, as she performed it, but not as generally performed (Tr. at 60-61, 63).

The VE further testified that should the individual be off-task more than 10% of the workday for any reason, then the individual would be unable to maintain employment. (Tr. at 63, 65) In response to questioning from Claimant's attorney, the VE testified that if the individual were limited to lifting no more than a gallon of milk, standing 10 to 15 minutes before having to

take a break for five to ten minutes at least three or four times a day, and sitting 30 to 35 minutes after which she would have to stand up or change positions and walking less than a block, all employment would be precluded. (Tr. at 64) Additionally, in consideration of the limitations determined by Dr. Tammy Bannister's RFC assessment in Exhibit 6F, *supra*, the VE determined that Claimant would be precluded from all employment. (<u>Id</u>.)

The VE testified that his testimony concerning the components of the RFC that are not specifically addressed in the Dictionary of Occupational Titles (DOT) were based on his education, work experience and resources from the Department of Labor and SkillTRAN Corporation and consultation with other vocational experts, otherwise, his testimony has been consistent with the DOT. (Tr. at 63-64)

## <u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)).  Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As noted *supra*, Claimant argues that the ALJ failed in his duty to develop the record with respect to several alleged impairments[2], and that he "completely ignored" Claimant's testimony and the medical documentation concerning the limitations her impairments caused. (ECF No 16 at 16) As an initial matter, with respect to Claimant's contention that the ALJ "completely ignored" her testimony and the medical documentation from her treating physician as to her limitations, the undersigned **FINDS** this argument lacks merit:

In his written decision, the ALJ specifically recalls not only Claimant's statements in her application for disability benefits, but also Claimant's testimony concerning not only her alleged mental impairments, but also as they related to her physical impairments from diabetes, hypertension, peripheral neuropathy, gastroesophageal reflux disease, asthma, insomnia, and pain in the legs, back and feet, all of which impaired her ability to function, let alone engage in substantial gainful activity. (Tr. at 18-19, 23, 26). He also recognized that Claimant had testified that her pain increased with walking, standing, bending, stooping, squatting, climbing stairs and lifting, as well as from the weather and that medications did not alleviate her pain. (Tr. at 23) The

---

[2] Claimant specified that the following impairments preclude her ability to engage in substantial gainful activity: arthritis; osteoarthritis of the spine/degenerative disc disease of the lumbar spine; right hip osteoarthritis; lower and upper back pain; left shoulder pain/arthralgia; restless leg syndrome; foot pain; left ankle osteoarthritis; psoriasis; asthma; depression; hypertension; diabetes; neuropathy; and COPD. (ECF No. 16 at 13, 16)

ALJ also noted that Claimant testified that her medications did not completely relieve her pain and that the side effects from her medication caused dry mouth, low energy, drowsiness, and grogginess. (Tr. at 23, 26) He also acknowledged Claimant's testimony she had poor sleep due to pain; that she had difficulty shopping in a store and had to sit after 10-15 minutes; he acknowledged her description of her neuropathy with stinging and burning in her feet that did not go away easily; that she had to eat small frequent meals because her sugar dropped or she would become disoriented; that she has fallen from her neuropathy and limited in her ability to stand; that she had gastroparesis which caused nausea and vomiting; that her left shoulder injury limited her mobility, where she could not lift things, move her arm behind her back far, and had difficulty fastening things in the back; that she could not lie on her shoulder like she used to; that her restless leg syndrome affected her sleep, and during the day she had to keep moving her legs; that she had pain in her legs, ankles, and feet with standing, but did not have swelling; that her asthma prevented her from walking half a block and that she used two inhalers; that she has shortness of breath with climbing stairs, walking, carrying items, and being around dust, odors, fumes, humidity, and cold environments; that she had to stop and rest for 15 minutes after having shortness of breath; that she had depression with no interest in anything, poor sleep, and low energy, and that she could not concentrate and felt worthless, and she did not want to be around others or have any social activities; that she received injections for her left shoulder, but they only lasted about two weeks; that she could stand 10-15 minutes, walk less than a block, sit for about 30-35 minutes, and lift a gallon of milk; that her husband did household chores; that on a typical day, she drank tea, ate breakfast, watched television and laid on a heating pad; that she had a mental health appointment scheduled, but it was cancelled and rescheduled for July; that she cared for her mother for six

21

months after she stopped working and that she got around okay but needed some help getting up, and that she would prepare for her mother simple meals but did not do housework for her, and that she would have a neighbor come over to help lift her mother. (Tr. at 23)

Further, in addition to discussing the relevant medical evidence of record (Tr. at 18-22, 24-26, discussed further, *infra*), the ALJ explicitly considered the opinion evidence of not just the state agency medical and psychological consultants, but also Claimant's treating provider, Dr. Tammy Bannister (Tr. at 26-28).

The Duty to Develop the Evidence:

In <u>Cook v. Heckler</u>, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." <u>Cook v. Heckler</u>, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." <u>Id</u>. The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim in order to determine if it met the requirements in the listings of impairments amounted to a neglect of his duty to develop the evidence. <u>Id</u>.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that she is disabled. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled." Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that she has an impairment, further, the Regulations are clear that this

responsibility is ongoing at each level of the administrative review process. Id. The Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as Claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-831 (8th Cir. 1994). In this case, Claimant was represented by counsel and the ALJ has the right to assume that Claimant's counsel was presenting the strongest case for benefits. See Laney v. Astrue, 2011 WL 11889, at *11 (S.D.W. Va. Jan. 4, 2011) (Eifert, M.J.) (citing Nichols v. Astrue, 2009 WL 2512417, at *4 (7th Cir. 2009). An ALJ's duty to develop the record does not require him to make specific inquiries into Claimant's treatment modalities or search for cumulative evidence; his duty is to obtain sufficient evidence upon which he can render an informed decision. Id. (internal citations omitted).

Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

With respect to Claimant's assertion that the ALJ failed to develop the evidence concerning her numerous impairments (See footnote 2, *supra*), it is noted that Claimant neither specifies what evidence was inadequately fleshed out by the ALJ, nor what evidence specifically supports her argument that she is disabled. For starters, it is important to recognize that this Circuit has recognized that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)); see also Call v. Berryhill, Civil Action No. 2:17- CV-02292, 2018 WL 4659342, *4 (S.D.W. Va. Sept. 28, 2018). To the extent that Claimant complains that the ALJ may not have specifically mentioned each of her alleged impairments[3], he stated that he considered all the evidence of record. (See Tr. at 16 ("After careful consideration of all the evidence. . ."); Tr. at 17, 22 ("After careful consideration of the entire record. . ."; and Tr. at 18 ("The undersigned considered all of the claimant's medically determinable impairments, including those that are not severe . . ."). Having so stated, this court should "take [him] at [his] word." Reid, 769 F.3d at 865 ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word."); see also Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter."); Christina W. v. Saul, No. 4:19-cv-00028-PK, 2019 WL 6344269, *4 (D. Utah Nov. 27, 2019)("Plaintiff further argues that

---

[3] Though Claimant does not identify or specify any one impairment that the ALJ failed to mention or consider, it appears that the ALJ took great pains to mention each of Claimant's alleged impairments and considered the symptoms related thereto and how they affected her overall functioning in his review of the medical and other evidence of record in the RFC assessment.

the ALJ erred in not explicitly discussing various pieces of evidence, particularly the fact that she is participating in a structured treatment program. While the ALJ must consider all the evidence, she need not recite each piece of evidence she has considered. The ALJ stated that she carefully considered the entire record and the Court can take her at her word."). Moreover, despite Claimant's listing the various diagnoses and symptoms related thereto in her brief, this is not the litmus test for disability, as it is also well known that diagnoses alone do not establish disability, because there must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (*per curiam*) (internal citations omitted).

Nevertheless, despite Claimant's assertion otherwise, the ALJ expressly considered the medical evidence from the treating sources of record, including medical evidence that predated the alleged onset date, since July and August 2017 (Tr. at 24). In addition to the opinion evidence (Tr. at 26-28), as well as the consultant examiner's report (Tr. at 24-25, 415-425), the ALJ also expressly considered Claimant's and the vocational expert's testimonies (Tr. at 18-19, 23, 26, 28). Indeed, as pointed out by the Commissioner, when asked by the ALJ at the beginning of the hearing if there was a complete record in this case, Claimant's attorney responded in the affirmative. (ECF No. 17 at 14, citing Tr. at 38; see also, Tr. at 15 ("The claimant submitted all written evidence at least five business days before the date of the claimant's scheduled hearing (20 C.F.R. 404.935(a))."). In short, Claimant has failed to demonstrate any paucity in the evidence that would have warranted further development of the record.

Accordingly, the undersigned **FINDS** that Claimant's contention that the ALJ erred by failing to develop the record is without merit.

Consideration of the Combined Effect of Impairments:

In a conclusory fashion, Claimant asserts that the medical evidence confirms that the combined effect of her severe physical and mental impairments rendered her totally disabled and meet or exceed Listing requirements. (ECF No. 16 at 17) Claimant does not specify which impairment specifically meets or equals any Listing, instead, she again emphasizes that the ALJ failed to consider the medical evidence from her "longtime" treating physicians. (Id.)

The Regulations provide:

In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

See 20 C.F.R. § 404.1523(c). When confronted with a combination of impairments, an adjudicator must not only acknowledge "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has held that the ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. Id. In short, the ALJ must analyze the cumulative or synergistic effect that the various impairments have on Claimant's ability to work. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

"The Listing of Impairments . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." See 20 C.F.R. § 404.1525(a); Sullivan

26

v. Zebley, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that her combination of impairments is "equivalent" to a listed impairment, and she "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See Id. at 531.  A claimant must meet all, not just some, of the criteria for a listing to apply. Id. at 530.

It is important to note that at the second step in the sequential evaluation process, the ALJ found numerous impairments that were not severe enough to have significantly limited Claimant's ability to perform basic work activities: gastritis; hepatic steatosis; hypertension; hyperlipidemia; vitamin B deficiency; restless leg syndrome; anxiety disorder; and depressive disorder. (Tr. at 18, 359-414, 426-436, 437-518, 545-559) The ALJ specifically noted that the evidence supported the conclusion that none of these conditions, either singly or in combination, resulted in more than a minimal impact on Claimant's ability to engage in work activities (Tr. at 18-19, 68-79, 254-263, 359-414, 426-436, 437-518, 545-559).

Next, at the third step of the sequential evaluation process, the ALJ first evaluated Claimant's impairments under Section 1.00 which pertains to the musculoskeletal system. (Tr. at 19-21) With regard to Claimant's right shoulder impairment, mild right hip osteoarthritis, and left ankle osteoarthritis under Listing 1.02, which concerns major dysfunction of a joint, the ALJ noted that the objective studies of record did not demonstrate major dysfunction of a joint characterized by gross anatomical deformity or joint space narrowing, bony destruction, or ankylosis of the affected joint. (Tr. at 20) The ALJ noted further that x-rays of Claimant's left ankle indicated osteoarthritis with milder subtalar degenerative changes, x-rays of her right hip showed mild osteoarthritis, and that x-rays of her left shoulder revealed mild hypertrophic changes, but no acute abnormality. (Tr. at 20, 415-425, 522-542) He further observed that clinical findings on exam did

not show that these conditions did not result in an inability to ambulate effectively or an inability to perform fine and gross movements effectively. (Tr. at 20, 359-414, 415-425, 426-436, 437-518, 545-559)

Regarding Claimant's degenerative disc disease of the lumbar spine, the ALJ further noted that Claimant's severe impairment also did not meet criteria under Listing 1.04, which concerns disorders of the spine, as there was no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. (Tr. at 20-21) The ALJ also considered the evidence under Acquiescence Ruling 15-1(4), and noted that there were no positive imaging showing significant nerve compression; that x-rays of the lumbar spine showed multilevel degenerative changes at L3-4, L4-5, and L5-S1 (Tr. at 21, 415-425); and that while an MRI showed mild disc desiccation at several levels and minor facet degenerative changes in the lower spine, there was no evidence of lumbar disc herniation, and no spinal canal or neural foraminal stenosis. (Tr. at 21, 444) The ALJ also found that no "treatment notes indicated listing level clinical findings such as gait abnormalities, a positive straight leg raise, motor strength weakness, sensory loss, or reflex abnormalities. (Tr. at 21, 359-414, 415-425, 426-436, 437-518, 545-559)

Regarding Claimant's asthma, the ALJ also recognized that while this impairment is severe, it failed to meet Listing requirements under 3.03: "[p]ulmonary function testing did not indicate listing level values as it indicated only moderate obstruction with 64-percent of predicted for FVC with 1.92 and 2.26 with bronchodilator; 54-percent of predicted of FEV1 with 1.25 and 1.43 with bronchodilator; 84-percent of predicted of FEV1/FVC with 65.2 and 63.3 post bronchodilator." (Tr. at 21, 369) Additionally, the ALJ observed that the record does not indicate asthma exacerbations or complication requiring hospitalization. (Tr. at 21)

28

Regarding Claimant's psoriasis, the ALJ assessed same under Listing 8.00 for skin conditions. (Id.) Again, the ALJ found that this condition did not meet or equal Listing requirements, as the record did not show she had extensive skin lesions involving multiple body sites or critical body areas that resulted in a very serious limitation that interfered with the motion of the joints that seriously limit the use of more than one extremity; there was no evidence that Claimant had skins lesions on the palms of her hands that would very seriously limit her ability to perform fine and gross motor movements or skin lesions on the soles of her feet, perineum, or both inguinal areas that very seriously limited her ability to ambulate. (Id.) The ALJ noted that Claimant's psoriasis seemed to respond to treatment, "as she had little follow up with dermatology." (Id.) While the ALJ acknowledged that Claimant had an Auspitz sign or small bleeding points distributed on the right medial plantar mid-foot and left medial planta mid-foot in August 2017 (Tr. at 21, 320-358), he noted that her primary care provider observed only thick scale on the heels of both feet along with scattered erythematous patches on the legs, arms and neck and that Claimant generally had a normal gait. (Tr. at 21, 359-414)

With regard to Claimant's diabetes, the ALJ acknowledged this impairment may cause symptoms or complications with regard to treatment similar to other impairments under pertinent Listings, and that SSR 14-2p and Listing 9.00 require him to consider Listing requirements under Sections 1.00, 2.00, 4.00, 5.00, 6.00, 8.00, 11.00, and 12.00. (Tr. at 21) Though the ALJ recognized that Claimant has a history of abnormally high blood glucose levels, there is no evidence of amputation, retinopathy, coronary artery disease, peripheral vascular disease, gastroparesis, nephropathy, skin infections, neuropathy or cognitive impairments that rise to the requirements under respective Listings for each body system. (Tr. at 21-22) The ALJ noted that Claimant's

29

diabetes required minimal treatment with medication and was fairly controlled, thus this impairment did not meet the criteria under Listing 9.00. (Tr. at 22, 359-414, 415-425, 426-436, 437-518, 545-559)

Finally, with regard to Claimant's neuropathy, the ALJ evaluated same under Listing 11.14, and noted that the medical evidence did not indicate disorganization of motor function in the lower extremities, an extreme limitation with the use of Claimant's upper extremities, or a marked limitation with physical or mental functioning; the ALJ further noted that Claimant's primary care provider and clinical findings showed minimal limitations, as Claimant generally had a normal gait, full motor strength, and intact sensation, thus, the ALJ found her neuropathy did not meet Listing 11.14. (Id.)

To the extent that Claimant takes issue with the ALJ's evaluation of her subjective complaints, it is noted that recently the Fourth Circuit held that "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." See Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020) (internal citations omitted). The Fourth Circuit "reiterate[d] the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms." Id. It is important to recognize that in Arakas, the Court concluded that substantial evidence did not support the ALJ's finding that the claimant's subjective complaints were inconsistent with her daily activities because the overall record actually supported her subjective complaints and demonstrated she would be unable to engage in substantial gainful activity. Id. Another significant, if not critical, aspect of the Arakas holding is that the Court found the ALJ's

30

analysis included misrepresentations or overinflation of the claimant's abilities, to the exclusion of that evidence which did not support such a conclusion. Id. Essentially, the Fourth Circuit has once again cautioned against an ALJ's analysis must not primarily rely upon the lack of objective medical evidence as the reason for discounting a claimant's complaints. As demonstrated by the foregoing, this did not occur here, the ALJ herein did not select only those portions from the objective medical evidence that failed to support Claimant's allegations of disabling impairments, the ALJ also examined both aggravating and mitigating factors with respect to Claimant's subjective complaints which included her testimony, her reports to providers, the objective medical evidence, as well as the opinion evidence. The law does not require one to be pain-free or experience no discomfort in order to be found not disabled. Hays v. Sullivan, 907 F.2d 1453, 1458 (4th Cir. 1996). In this case, the ALJ provided a thorough and adequate analysis of Claimant's subjective complaints that complied with the pertinent Regulations and case law.

Clearly, the ALJ considered the medical evidence as well as Claimant's reported symptomology from the relevant time period. As discussed *supra*, the ALJ did consider this evidence in making his third step determination, thus, to the extent that Claimant argues that the ALJ failed to consider and evaluate the combined effects of her impairments, the undersigned **FINDS** this argument lacks merit. Additionally, to the extent that Claimant contends the ALJ failed to consider the medical records provided by her treating physician(s), the undersigned **FINDS** this contention also lacks merit. Finally, to the extent that Claimant asserts the ALJ failed to consider her subjective complaints, the undersigned **FINDS** that the ALJ's subjective symptoms analysis complied with the pertinent Regulations and controlling case law and is based upon substantial evidence. The undersigned further **FINDS** the ALJ's discussion of the objective and other

evidence of record in his evaluation of Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms, and that the ALJ's conclusion that Claimant's statements were inconsistent with the evidence of record complied with the applicable law, is also supported by substantial evidence.

Evaluation of Opinion Evidence:

Claimant argues that the ALJ "substituted" his own opinion with those provided by Claimant's treating physicians, ostensibly because the ALJ did not adopt Dr. Bannister's opinion that Claimant was disabled (ECF No. 16 at 17). In the written decision, the ALJ explicitly applied the regulatory framework pursuant to Section 404.1520c to claims filed after March 27, 2017: "[a]s for medical opinions and prior administrative medical findings, the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical findings or medical opinions, *including those from medical sources*." (Tr. at 26) (emphasis added) Here, the ALJ properly applied Section 404.1520c, which emphasizes the supportability and consistency factors when assessing the persuasiveness of the medical opinions of record. Instead of assigning weight to medical opinions, the ALJ now just considers the persuasiveness of a medical opinion (or a prior administrative medical finding). Id. 404.1520c(b)(2). Critically, the source of the opinion is not the most important factor in evaluating its persuasive value, instead, the most important factors are supportability and consistency. Id. When discussing his finding about whether an opinion is persuasive, the ALJ need only explain how he considered the "the most important factors" of supportability and consistency. Id. § 416.1520c(c). The ALJ "may" comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. Id. § 404.1520c(b)(2)-(3).

In this case, the ALJ appropriately recognized that pursuant to 20 C.F.R. § 404.1527(d), he found the opinions provided by Dr. Bannister "not persuasive", specifically noting her September 2018 comment in a treatment note that Claimant should consider disability because "she thought the claimant could not be gainfully employed." (Tr. at 27, 367) The ALJ correctly observed that "[t]his statement is not an opinion under the current rules, but it was considered." (Tr. at 27) The ALJ also determined the opinion was not supported by a review of the record or consistent with Dr. Bannister's own clinical findings on exam, "which generally observed the claimant was depressed with a flat affect but did not note additional mental limitations. She also reported full motor strength, intact sensation and generally a normal gait on exam." (Tr. at 27, 359-414, 426-436, 437-518, 545-559) The ALJ then considered the residual functional capacity form Dr. Bannister completed, addressing the physical limitations endorsed by the treating source (described *supra*) (Tr. at 27, 519-521), and also determined this opinion was not persuasive, explaining:

> [T]he objective studies of record including MRIs and x-rays of the claimant's musculoskeletal impairments showed minimal findings (3F and 5F). Dr. Bannister's own treatment records noted the claimant had full motor strength, generally had a normal gait, and intact sensation consistent with the residual functional capacity (2F, 4F, 5F, and 9F).

(Tr. at 27-28, 359-414, 415-425, 426-436, 437-518, 545-559) The Regulations and pertinent case law support not only the ALJ's observation, but also, an RFC assessment lies squarely with the ALJ, not with any medical provider/examiner. 20 C.F.R. § 404.1546(c); see Felton-Miller v. Astrue, 459 Fed. App'x 226, 230-31 (4th Cir. 2011) ("The ALJ was not required to obtain an expert medical opinion as to [the] RFC.").

33

Although Claimant advocates for an alternate decision, such are matters that involve resolving the conflicting evidence of record, which is an evidentiary finding within the purview of the ALJ. In short, though Claimant may disagree with the ALJ's determination that she is not disabled, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7. The ALJ's narrative of the record included the objective medical evidence, including imaging, and clinical examination findings, as well as the other evidence of record, including but not limited to Claimant's own statements and testimony; the ALJ's thorough discussion of all this evidence, and his ultimate determination that Claimant remained capable of her past relevant work during the relevant period despite her subjective complaints, provided sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. Id. at 637. Accordingly, the undersigned **FINDS** the ALJ's evaluation of the opinion evidence is supported by substantial evidence.

Finally, the undersigned **FINDS** that the Commissioner's final decision determining that Claimant was not disabled from September 14, 2017 through the date of the decision is supported by substantial evidence.

## **Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (ECF No. 15), **GRANT** the

Defendant's request to affirm the decision below (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: August 27, 2021.



Omar J. Aboulhosn
United States Magistrate Judge